## CURRAN & TREADAWAY, Inc., v. AMERICAN BONDING CO. OF BALTIMORE.*

### No. 17151.

Court of Appeal of Louisiana.    Orleans.

March 27, 1939.

Gill & Simon, of New Orleans (Warren M. Simon, of New Orleans, of counsel), for appellant.

P. M. Milner, of New Orleans, for appellee.

JANVIER, Judge.

Curran & Treadaway, Inc., is engaged in business in New Orleans as real estate agents and brokers.

Between March 23, 1937, and November 25, 1937, it had in its employ, as a rent collector, Gerard Walter O'Sullivan. When it employed O'Sullivan, it obtained from defendant, American Bonding Company, a fidelity bond in the sum of $1,000, under which the bonding company agreed that it would reimburse the said real estate corporation for any loss up to $1,000 caused "through any act of larceny or embezzlement committed" by such bonded employee. During the Month of November, 1937, the said employee embezzled and converted to his own use rent collections in excess of the amount of the bond. This loss was promptly reported to the bonding company and an investigation was commenced by that company. During the course of that investigation Mr. Curran, president of plaintiff real estate corporation, and Mr. P. M. Milner, attorney for defendant bonding company, discussed the matter, and, as a result of that conversation and of another had immediately thereafter, but at which in addition there was present Mr. J. Costello Otto, also an attorney and adjuster for the said bonding company, the representatives of the bonding company became convinced that, before the embezzlement on which this suit is based, Mr. Curran had discovered that the bonded employee had been guilty of other dishonest acts.

Having reached this conclusion the officials of the bonding company refused to make payment under the bond, taking the position that, by its own terms, it had been terminated upon the discovery by Mr. Curran of the other and earlier dishonest acts; and, as authorizing this position, it pointed to a policy provision reading as follows:

"This bond shall terminate as to future acts of any Employee immediately upon discovery by the Employer, or, if a corporation, by any director thereof or by any officer thereof not in collusion with such Employee, of any dishonest act on the part of such Employee whether in the service of the Employer or otherwise."

The plaintiff corporation maintained, however, that at those conferences Mr. Curran had made no statement indicating that he had knowledge of any prior dishonest act on the part of the bonded employee and also that, if Mr. Curran had made any such statement, the words used did not indicate that any dishonest act had been committed, but merely that the bonded employee had done something which was wrongful but not necessarily dishonest.

In the court below there was judgment for defendant bonding company and plaintiff has appealed.

Whether or not Mr. Curran, prior to the defalcation on which this suit was based, had obtained knowledge of any other dishonest acts of the bonded employee, is a question of fact. Mr. Milner and Mr. Otto both state that, in their conversations with Mr. Curran, they had referred to a certain check for $250 which the plaintiff corporation had given to the bonded employee and that, in explaining this check, Mr. Curran had said to them that it represented an amount loaned to the bonded employee to enable him to make good a "shortage" in his collections made for another employer, a Mr. Wilson. Mr. Milner narrates the conversation as follows:

"* * * Mr. Curran came to my office, and I sent for Mr. Otto, whereupon Mr. Curran made this positive, absolute, and unequivocable statement, that O'Sullivan had collected the rent not only for Curran & Treadaway, but for other people, and about September 10th, he had come to Mr. Curran and told him that he was short in his accounts with Mr. Wilson, one of his clients, and that he needed two hundred and fifty dollars to cover up that shortage,—That he had asked Curran to lend him the two hundred and fifty dollars. Mr. Curran admitted to Mr. Otto, and to me, that he had lent him the two hundred and fifty dollars to cover up the Wilson shortage, and that it had been paid back."

Mr. Otto gives the following version:

"He (Curran) told us that on September 10th, he had issued a check to O'Sullivan for two hundred and fifty dollars, which was paid by the bank on September 11th, 1937, being funds that O'Sullivan had asked Curran to lend him. This was a check of Curran & Treadaway, which he asked Curran to lend him to cover a shortage that he—O'Sullivan had.

\*      \*      \*      \*      \*      \*

"It was on collections made by O'Sullivan. O'Sullivan collected rents for Wilson, and Curran & Treadaway, and O'Sullivan told Mr. Curran, and Mr. Curran told us, that O'Sullivan told him, that he was short—didn't have sufficient money to pay Wilson, on the Wilson collections. O'Sullivan asked Curran to lend him enough money to make these payments, and Mr. Curran advanced him this two hundred and fifty dollars."

Mr. Curran denied absolutely that he had made any such statement and the argument is made that he could not have done so for the reason that thereafter he retained O'Sullivan in the employ of his corporation, which he certainly would not have done had he known of any prior "shortage." But Mr. O'Sullivan admits that, when he obtained the advance of $250, his purpose was to make good a "shortage" in collections which he had made for another employer. He states:

" \*    \*    \* I borrowed two hundred and fifty dollars from Mr. Curran to apply to the accounts of people I was collecting money for."

It is true that he says, also, that he did not tell Mr. Curran why he needed this money. But the fact that he did use it for the very purpose concerning which Mr. Milner and Mr. Otto testified is most significant. It appears that, at the time of that conversation, Mr. Milner, as attorney for the bonding company, had advised his client to make payment under the bond, for there were other defenses which he thought were not legally sound. It was only by chance—when he heard of this prior "shortage" and discovered that such a prior "shortage," if resulting from a dishonest act, would have terminated the bond—that he then advised his company not to make payment, basing his defense this time solely on the conversation which he had had with Mr. Curran.

It is inconceivable that, having advised his company to make payment and then having changed his position, he had no compelling reason for doing so. The only reason which appears in the record was the information which he must have obtained from Mr. Curran during that conversation.

Furthermore, it appears that, after the conversation at which Mr. Curran, Mr. Otto and Mr. Milner were present, Mr. Curran addressed a letter to the American Bonding Company in which he confirmed most of what had taken place at that conference, but from which he omitted any reference to the $250 loan to O'Sullivan. Immediately upon receipt of a copy of that letter Mr. Milner himself wrote, charging that reference to that $250 loan had been omitted from Mr. Curran's letter. Surely Mr. Milner would not have done that when the matter was fresh in his mind if he had not been certain that Mr. Curran had made the statement attributed to him.

In view, therefore, of the testimony of Mr. Milner and Mr. Otto, which was believed by the judge of the district court, we conclude that the true fact is that in the Month of September, when Mr. Curran agreed to advance O'Sullivan the $250 referred to, he had knowledge that O'Sullivan needed the money to make good a "shortage" in his collections for Mr. Wilson.

But counsel maintains that, even if Mr. Curran actually knew that there was a "shortage," there is nothing in the record to show that he knew that such a "shortage" involved anything dishonest, and they maintain that it is not every "shortage" which is dishonest and that, therefore, if defendant is to establish the fact that the bond was terminated by knowledge which Curran had of a prior dishonest act, it is incumbent upon defendant to show that the shortage here relied upon involved dishonesty and that Curran knew it.

Counsel directs our attention to what is said by Mr. Couch in his Cyclopedia of Insurance Law, Vol. V, sec. 1199i, page 4355:

" \*    \*    \* Nor does the mere fact that a shortage is found justify a finding of fraud or dishonesty. For instance, a bond guaranteeing against loss by fraud or dishonesty, does not cover a mere indebtedness of the employee to the employer. And a mere technical diversion of funds does not constitute personal dishonesty."

And our attention is also directed to the case of Bank of Commerce v. Union In-

demnity Company, 174 La. 1014, 142 So. 156.

In the case cited there was involved the distinction between a policy or bond concerning losses caused by wrongful acts and a policy or bond concerning losses caused by fraud or dishonesty. The employee, who was involved in that case, had drawn his salary ($150) in advance, but, at the same time, "had placed in the till his due bill for a like amount." The policy then in force covered losses caused by fraud or dishonesty and this policy had taken the place of a former policy which covered losses caused by wrongful acts. The court, finding that the employee had "simply drawn his salary for one month in advance; and did not attempt to hide it," said:

"This was wrongful, because not authorized, but it was not necessarily dishonest."

But there it appeared—as the court found—that there was no criminal intent and no dishonest attempt to hide the act.

■ But there can be no doubt that, unless explained, the word "shortage" is almost synonymous with "embezzlement." True enough, it may be that one may be "short" in the sense that he has not enough money to pay his debts, but that is not usually the significance which is attached to the word, and where it is shown that one is "short" in the money which he has collected for someone else, it would require considerable explanation to establish the fact that there is no dishonesty connected with such shortage. At any rate, it was Curran who used the word "shortage" and, if he did not intend that it should be interpreted in its usual sense, it was his duty to explain it; to testify to the facts which might indicate that no dishonesty was involved. In the absence of any such explanation, when Mr. Curran told the bonding company that he had discovered that the bonded employee was "short" in his accounts with someone else, the bonding company was justified in assuming that the shortage resulted from a dishonest act and in treating the bond as having been terminated by the discovery of that act.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is affirmed, at the cost of appellant.

Affirmed.